# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HOPE KASPER, ET AL., | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | Civil Action No. |
| | : | 3:02 CV 844 (CFD) |
| CITY OF MIDDLETOWN, ET AL., | : | |
|     Defendants. | : | |

## RULING ON PENDING MOTIONS

Hope Kasper and Helen Kerkes brought this action against the City of Middletown
("Middletown"), Debra Moore ("Moore"), and Local 466, Council 4, of the American Federation
of State, County and Municipal Employees, AFL-CIO ("Local 466" or "Union"), alleging
violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1983; the
Fourteenth Amendment to the United States Constitution; and the Connecticut common law tort
of intentional infliction of emotional distress.  Count One alleges that Middletown discriminated
against the plaintiffs on the basis of their sex, and Count Two alleges that Local 466
discriminated against the plaintiffs on the same basis.  Count Three alleges that Middletown and
Local 466 engaged in concerted action to deprive the plaintiffs of equal protection of the laws in
violation of the Fourteenth Amendment and 42 U.S.C. § 1983.[1]  Count Four alleges that
defendants Middletown and Local 466 jointly committed the state law tort of  intentional
infliction of emotional distress.[2]

---

[1] Moore currently is Middletown's Director of Personnel.  At oral argument, the plaintiffs
represented that they withdrew all claims against Moore on this count, as she was not employed
by Middletown at the time of the alleged violations.

[2] The plaintiffs represented at oral argument that they also withdrew all claims against
Moore as to this count.  Moore was not named in Counts One and Two of the complaint.
Therefore, the Court considers Moore to be dismissed from this action.

Middletown has filed a Motion to Dismiss or in the Alternative for Summary Judgment. Local 466 has filed a Motion to Dismiss or for Summary Judgment.

I.    **Factual Background[3]**

A.    **Introduction**

Kasper and Kerkes are long-time employees of Middletown, and at one time belonged to Local 466, which represents Middletown municipal employees and employees of the Middletown Board of Education.

Local 466 is considered a "wall-to-wall" bargaining unit, in that it represents all Middletown municipal employees, regardless of job classification. The union contains two general categories of employees: those employed in "white-collar" jobs, who are predominantly female, and those employed in "blue-collar" jobs, who are predominantly male. Kasper and Kerkes (both white-collar employees) allege that the distinction between white- and blue-collar workers is based on sex rather than job classification, and that Local 466 and Middletown conspired to treat the white-collar portion of the union less favorably because those workers were predominantly women. Kasper and Kerkes claim that the defendants' discriminatory conduct came to a head as Local 466's collective bargaining agreement was set to expire in June 1999.

B.    **Chronology**

In January 1999, both plaintiffs ran for office in Local 466. Kasper sought election as the union's president, while Kerkes ran for election as First Vice President.[4] The union election was

_____

[3]The following facts are taken from the parties' Local Rule 56 Statements, as well as materials submitted with the parties' summary judgment motions, and are undisputed unless otherwise indicated.

[4] The Local 466 leadership structure consists of a President, a First Vice President, and four divisional Vice Presidents. While the First Vice President may be from any job category,

held on January 21, 1999. Kasper and Kerkes both lost their races. They then (along with one of

the losing blue-collar divisional vice president candidates) formally protested the election results

to a judicial panel of Local 466's parent union, the American Federation of State, County, and

Municipal Employees ("AFSCME"). Kasper's and Kerkes' principal complaint was that election

officials improperly had counted absentee ballots in the final total, when such ballots are

prohibited by AFSCME rules.[5] If only walk-in votes had been counted, Kasper and Kerkes both

would have won their respective races. On April 22, 1999, the AFSCME judicial panel ruled

that although absentee ballots indeed were prohibited, the confusion within Local 466 on this

item meant that discounting the absentee ballots cast would disenfranchise some union

members.[6] AFSCME ordered a new election to be held within forty days of its ruling.[7]

At the same time that they were protesting the Local 466 election results, Kasper and

Kerkes assisted the Connecticut Independent Labor Union ("CILU") in soliciting support from

white-collar union members to force a different election, this time on the issue of whether there

should be an independent white-collar bargaining unit. CILU filed a petition with the

---

two of the divisional vice presidents must be representatives of the white-collar employees at
City Hall and at the Board of Education. Kerkes had served as divisional vice president for the
white-collar school board employees since 1997.

[5] In their protest to AFSCME, Kasper and Kerkes also alleged that blue-collar vice-
presidential candidate Philip Lombardo had driven voters to the polls, an privilege that no other
candidate enjoyed and one that violated the AFSCME Bill of Rights for Union Members.

[6] The AFSCME panel dismissed the complaint about Philip Lombardo's driving members
to the polls, as there was conflicting testimony as to whether he provided such assistance.

[7] The results of this second election are not clear from the record before the Court. A
letter signed by Kerkes and Kasper on August 12, 1999, however, lists their titles as Local 466
Vice President and White-Collar City Hall Vice President, respectively. In any case, plaintiffs
have not made any allegations in their complaint as to this second election.

Connecticut State Board of Labor Relations ("SBLR") on January 28, 1999, seeking to "carve

out" the white-collar employees from Local 466 and represent them as an independent union. An

election on the proposed carve-out was held on May 13, 1999. White-collar workers had the

choice of four options: 1) to elect representation by CILU; 2) to elect continued representation by

Local 466; 3) to elect representation by an AFSCME bargaining unit distinct from Local 466; or

4) to have no union representation at all. The white-collar workers voted to form a separate

union affiliated with CILU.[8] Because the pro-CILU vote would create a new union in the state,

the proposed change had to be ratified by the Connecticut State Board of Labor Relations. On

April 13, 2000, the State Board of Labor Relations denied CILU's request to carve out the white-

collar employees into their own unit (notwithstanding the election results), ruling that the white-

collar employees did not possess sufficiently unique job characteristics to warrant a separate

union. The carve-out election results were dismissed, and the white-collar employees remained

members of Local 466.

While these various proceedings were pending, Local 466 was operating under a

collective bargaining agreement that expired June 30, 1999. As Local 466 and Middletown

sought to begin negotiating a successor agreement, the SBLR was still considering the white-

collar employees' carve-out request. On August 5, 1999, Local 466 and Middletown entered into

an agreement to negotiate for a new blue-collar contract, and included a clause that should the

SBLR deny the carve-out, the scope of negotiations would expand to cover all issues pertaining

---

[8] Of the votes counted, 59 ballots were in favor of a separate unit affiliated with CILU, 53 were in favor of a separate unit affiliated with AFSCME, and 19 were for remaining affiliated with Local 466. Twenty-six ballots, those cast by cafeteria workers, were impounded and not added to the final totals. This was due to Middletown's challenging the appropriateness of including cafeteria workers in the white-collar union. CILU later abandoned its attempt to represent the cafeteria workers and mooted the issue.

to white-collar workers.[9]  Based in part upon that signed agreement, Middletown and Local 466

entered into a new contract on April 6, 2000.  The blue-collar workers enjoyed the higher salaries

and benefits of the new contract immediately.  As the contract was retroactive to June 30, 1999,

blue-collar workers also received an additional payout to make them whole as of that date.

Approximately a week later, the State Board of Labor Relations issued its decision

denying a separate bargaining unit to the white-collar employees.  An extension of Local 466's

new collective bargaining agreement, also applying its terms to white-collar workers, then was

signed on October 25, 2000.  At that point, the white-collar workers began to receive the same

salary and benefit increases as the blue-collar workers; white-collar employees also received

supplementary compensation to make them whole for the retroactive period of June 30, 1999

until October 25, 2000.  The extension of the collective bargaining agreement to white-collar

workers made no other changes to the original contract, apart from a few amendments relating to

the work schedules of communication dispatchers.[10]

Kasper and Kerkes allege that due to their involvement in these events, they suffered

various acts of discrimination.  On August 24, 2000, Kasper filed a complaint with the

Connecticut Commission on Human Rights and Opportunities ("CHRO") against Middletown

and Local 466 alleging gender discrimination, retaliation and harassment.  Kerkes filed a

---

[9] During the period of SBLR review, white-collar workers received the same salaries and privileges set by the previous collective bargaining agreement.  Kasper and Kerkes also protested the decision to hold the white-collar negotiations in abeyance and filed additional complaints with the SBLR, arguing that the decision to postpone such negotiations violated the Connecticut Municipal Employees Relations Act.  The status of those complaints is not clear from the record before the Court, but neither plaintiff specifically raises them as an issue in this action.

[10] From the documents before the Court, "civilian dispatchers," as they are referred to, appear to be classified as white-collar employees.

virtually identical complaint with the CHRO on August 28, 2000.

## II.    Discussion

### A.    Legal Standard

Under Rule 12(b) of the Federal Rules of Civil Procedure, "[i]f, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . ." Defendants Middletown and Local 466 each filed their pending motions as motions to dismiss or, in the alternative, as motions for summary judgment. As part of those motions, each defendant also filed a Rule 56 statement. The plaintiffs responded to defendants' motions by submitting their own Rule 56 statement. As all these statements concern details outside the pleadings, their consideration by the Court requires that the pending motions be deemed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[11] See Dacourt Group, Inc. v. Babcock Indus., Inc., 747 F. Supp. 157, 159-60 (D. Conn. 1990).

In the context of a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted). In ruling on a

---

[11] In oral argument before the Court, the plaintiffs did not contest treating defendants' motions as motions for summary judgment.

motion for summary judgment, however, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

**B.    Plaintiffs' Title VII Claims Against Middletown (Count One)**

    **1.    Discrete Employment Actions**

Kasper and Kerkes allege that as white-collar employees, they were required to work under the terms and conditions of a less favorable collective bargaining agreement than that covering blue-collar employees. The substance of their claim appears to be that Middletown and Local 466 discriminated against them on the basis of sex by signing a new collective bargaining agreement whose terms applied only to blue-collar workers, by not waiting to negotiate with the entire union until the "carve-out" election had been ruled upon, or by not negotiating with the white-collar workers while the "carve-out" issue was being resolved. Pending resolution of the carve-out election, the new contract's terms applied only to blue-collar workers, meaning that employees in those job categories earned higher salaries than white-collar members of the same union for a period of several months.[12] Second, Kasper and Kerkes allege that Middletown and Local 466 conspired to prevent the plaintiffs from being elected to a union office. Finally, Kasper alleges that on June 8, 2000, Middletown attempted to remove her as the only female

---

[12] As noted previously, both groups of employees ultimately received supplemental compensation to make them whole under the contract's retroactive effective date of June 30, 1999.

7

member of the committee managing city employees' retirement benefits and to replace her with a male employee.  Defendant Middletown alleges that it is entitled to summary judgment on the first two of these claims, those relating to the blue-collar employees' contract and the Local 466 leadership election, because Kasper and Kerkes are time-barred from bringing an action on those grounds.

Generally, discrimination claims under Title VII must be filed with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).  When, however, one has filed a charge of discrimination in a state or locality that has its own antidiscrimination laws and enforcement agency, the time period for filing claims with the EEOC is extended to 300 days from the date of the unlawful practice. 42 U.S.C. § 2000e-5(e)(1); Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996). Connecticut has its own anti-discrimination agency, the CHRO, with which both Kasper and Kerkes filed charges.  Thus, the 300-day limit applies.[13]  The 300-day requirement also functions as a statute of limitations, so that "discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court." Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998).  Because Kasper filed her complaint with the CHRO on August 24, 2000, she is precluded here from bringing any claims that occurred before October 28, 1999 (300 days prior to the date of her CHRO filing).  Kerkes filed her complaint with the CHRO on August 28, 2000, so she is precluded from bringing any claims that occurred before November 1, 1999.

---

[13] The Court assumes for the purposes of this ruling that the dates of Kasper's and Kerkes' filings with the CHRO control for purposes of determining their respective relevant limitations periods.

The plaintiffs provided no dates in their complaint as to when the allegedly discriminatory election took place. In their Rule 56 statement of facts, however, they agreed with defendants that the election took place in January 1999. As plaintiffs are time-barred from bringing claims occurring before October 28, 1999, this event falls outside the applicable statute of limitations. Therefore, summary judgment is granted for defendant Middletown as to all allegations based on the Local 466 leadership election.[14]

The parties do contest when the allegedly discriminatory contract is alleged to have taken effect. Middletown argues that the effective date of the collective bargaining agreement should be August 5, 1999, the date that it and Local 466 signed a memorandum of understanding to begin negotiations.[15] In contrast, plaintiffs alleged in their complaint in this Court that Middletown and Local 466 entered into the discriminatory contract "on or about" March 2000.[16]

In support of its position, Middletown submitted as part of its summary judgment papers copies of the CHRO's correspondence with plaintiffs. The CHRO, after investigating plaintiffs' complaints to that agency, dismissed those complaints for lack of probable cause and

---

[14] From the Complaint, those allegations appear to be that Middletown assisted in transporting blue-collar workers in city vehicles to the election site. The plaintiffs offered no evidence in support of this allegation at the summary judgment stage. Plaintiffs' similar charges, raised as an election grievance to AFSCME, were dismissed due to conflicting evidence as to whether such assistance occurred.

[15] As discussed previously, that memorandum included a clause providing that, should the SBLR deny the white-collar employees' petition for separate representation, negotiations would expand to cover those employees under a single consolidated collective bargaining agreement.

[16] While plaintiffs allege that Middletown and Local 466 entered into a discriminatory contract in March 2000, there is no evidence before the Court that any collective bargaining agreement was signed by defendants during that month. From the substance of their allegations, it appears that plaintiffs are complaining about the successor collective bargaining agreement for blue-collar employees, which took effect on April 6, 2000. The extension of that contract to white-collar employees was signed on October 25, 2000.

9

untimeliness. The agency concluded that the effective date of the blue-collar contract was August 5, 1999, the date of the original memorandum of understanding. Plaintiffs responded to Middletown's submission by filing a motion to strike those exhibits, on the ground that the agency records constitute inadmissible hearsay. See Docs. # 54, 55. The Court denied the motion to strike in an Order dated September 30, 2004, noting that plaintiffs' objections would be considered in ruling on the instant summary judgment motion. See Doc. # 69.

Plaintiffs also argued in their motion to strike that the underlying record of a state administrative agency is inadmissible in a Title VII employment discrimination action, because Congress intended in passing Title VII to provide for a de novo trial on such claims. It is true that "unreviewed decisions of state administrative agencies will not bar a subsequent de novo trial under Title VII in federal court." Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 728 (2d Cir. 2001); see also Univ. of Tennessee v. Elliott, 478 U.S. 788 (1986). The state agency record, however, is not entirely without evidentiary value. Title VII itself provides that the EEOC accord "substantial weight" to final findings and orders by state employment discrimination agencies, and prior administrative findings may be introduced as evidence at a subsequent federal trial. 42 U.S.C. § 2000e-5(b); see also Astoria Fed. Sav. & Loan v. Solimino, 501 U.S. 104, 113 (1991) (holding that even when state administrative findings lack preclusive effect, they retain evidentiary value); Chandler v. Roudebush, 425 U.S. 840, 864 (1976) (holding that administrative findings have evidentiary value to federal trial courts). While state agencies' conclusions are not binding upon federal courts, federal courts certainly may consider secondary facts contained in a state agency's record, since that record itself is a mandatory prerequisite to filing a Title VII claim.

10

The Court holds that the CHRO correspondence to which plaintiffs object does not constitute inadmissible hearsay, but rather should be deemed admissible under Federal Rule of Evidence 803(8)(C). That rule provides a hearsay exception in civil actions for "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The scope of factual findings encompassed by Rule 803(8)(C) also includes "factually based conclusions or opinions." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 162 (1988). While Middletown's copies of these documents have not been attested or accompanied by an affidavit, Local Rule 56(3) only requires that statements of material fact offered in support of summary judgment be accompanied by "evidence that would be admissible at trial." Conn. L. Civ. R. 56(3). Because the Court determines that there is nothing to suggest the untrustworthiness of the CHRO documents, and that the correspondence would be admissible at trial pursuant to Fed. R. Evid. 803(8)(C), the dates contained in those documents will be considered material facts for the purposes of this summary judgment motion.

Nonetheless, even if the CHRO documents are admissible, the record contains a potential dispute of material fact. The agreement extending Local 466's new contract's benefits to white-collar workers was not signed until October 25, 2000. In addition, that agreement states that the underlying contract itself was not signed until April 6, 2000. Both of these dates fall within plaintiffs' statute of limitations. The Supreme Court has held that when an employee's cause of action "is wholly dependent on the alleged illegality of signing the underlying [collective bargaining] agreement, it is the date of that signing which governs the limitations period." Lorance v. AT&T Tech., 490 U.S. 900, 911 (1989).

11

In Lorance, three female AT&T employees challenged a modification to AT&T's seniority system, arguing that it was the product of a conspiracy to advantage a group of predominantly male workers and to deter female AT&T employees from seeking promotions to that job group. The Lorance plaintiffs' claims only accrued in 1983, when they were demoted under the modified seniority system. See id. at 902-03. The Supreme Court ruled, however, that the plaintiffs' true claim was that their contractual rights had been discriminatorily altered when the old seniority system was modified. That modification took effect by way of a collective bargaining agreement signed in 1979. While the Lorance plaintiffs personally did not feel the effects of the alleged discrimination until 1983, that alleged discrimination occurred four years earlier upon the signing of the collective bargaining agreement. Therefore, the Lorance plaintiffs' claim was time-barred according to the timely filing provisions of Title VII. See id. at 905-08. Applying Lorance suggests that either of two dates might constitute the instigating event here: August 5, 1999, when the defendants signed a memorandum of understanding to negotiate only on behalf of the blue-collar employees, or April 6, 2000, when the blue-collar employees began to work under a new collective bargaining agreement whose benefits were not extended to white-collar employees for another seven months.

Even if plaintiffs' proffered date in April 2000 governs, however, the plaintiffs face an additional difficulty. When a challenged collective bargaining agreement is facially neutral, Title VII also requires that the plaintiff(s) make out a prima facie case of disparate impact to succeed.[17]

---

[17] The plaintiffs have not made out a disparate treatment claim, because they do not allege that the collective bargaining agreement operates in an intentionally sexually discriminatory manner, nor that the underlying negotiations operated on a basis of intentional sex discrimination. Nor do plaintiffs allege that similarly situated male white-collar employees were treated differently from them. Kasper and Kerkes merely allege that the defendants agreed to negotiate on behalf of the (mostly male) blue-collar employees first, without waiting for the

12

See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 430-32 (1971); Brown v. Coach Stores, 163

F.3d 706, 712 (2d Cir. 1998).  The Second Circuit has ruled that such a prima facie case requires

a showing that a specific employment practice has caused a significant disparate impact on

members of a protected group.  See Brown, 163 F.3d at 712.  "[A] plaintiff generally cannot rely

on the overall decision-making process of the employer as a specific employment practice."

Smith v. Xerox Corp., 196 F.3d 358, 367 (2d Cir. 1999).  Furthermore, allegations that "contend

only that there is a bottom line . . . imbalance in the work force are insufficient."  Brown, 163

F.3d 712; see also Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 159 (2d Cir. 1991).  In

their complaint, plaintiffs alleged that the white-collar/blue-collar distinction was based upon

sex: There are approximately 37 female and 190 male blue-collar workers in Local 466, and

approximately 15 male and 131 female white-collar employees.  Plaintiffs also alleged that in

one instance, a female snow plow operator was classified as a white-collar secretary instead of

her true blue-collar designation.  Plaintiffs' numerical data constitute "bottom line" numerical

figures that Brown has decreed are insufficient to make out a prima facie case.  Nor is the single

alleged instance of a female employee being wrongly classified as a white-collar worker enough

to show that the Local 466 collective bargaining agreement had a significant disparate impact on

any protected group.

---

resolution of the (mostly female) white-collar employees' carve-out petition.  This caused those
blue-collar employees to receive higher salaries under the new collective bargaining agreement
for several months before white-collar employees were able to receive the same benefits.  Kasper
and Kerkes also allege that the contract contains non-gender-neutral language assuming that the
covered blue-collar employees are male.  The Court does not consider this latter allegation to be
one of discriminatory animus, merely a sad vestige of the English language's preference for what
has been called the "generic masculine."  Compare Debora Schweikart, The Gender Neutral
Pronoun Redefined, 20 Women's Rts. L. Rep. 1 (1998).  Accordingly, as there is no showing of
intentional sex discrimination or animus, the Court evaluates plaintiffs' claim under the disparate
impact theory only.

Therefore, even assuming that plaintiffs' complaints about the collective bargaining agreement are not time-barred, plaintiffs have failed to make a prima facie case upon which to rest a disparate impact claim.  In addition, the plaintiffs have offered no evidence at all with which to supplement their pleadings.  When responding to a summary judgment motion, the nonmoving party must "by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).  "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002) (citing Yin Jing Gan v. City of New York, 996 F.2d 522, 532-33 (2d Cir. 1993)).  If the nonmoving party provides "little or no evidence" supporting his allegations, "there is no genuine issue of material fact and summary judgment may be appropriate." Grey v. City of Norwalk Bd. of Educ., 2004 WL 231171, *3 (D. Conn. Feb. 4, 2004) (citing Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994)).  The Court concludes that the plaintiffs' claims relating to the collective bargaining agreement entered into by Middletown in 1999-2000, and the differing dates of its coverage of white- and blue-collar workers, fail as a matter of law.

Kasper's remaining timely allegation, that Middletown attempted to remove her from the city retirement committee in June 2000, will be analyzed on its merits.  Allegations of disparate treatment are evaluated under the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under the McDonnell Douglas rubric, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  To do so, a claimant must show that: 1) she belonged to a protected class; 2) she was qualified for the position; 3) she suffered an

14

adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  See id.; see also Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003).  If the plaintiff satisfies these requirements, the burden then shifts to the defendant to offer a legitimate, non-discriminatory rationale for its actions.  McDonnell Douglas, 411 U.S. at 802.  Once the defendant demonstrates a non-discriminatory reason for its decision, the burden again shifts to the plaintiff, who now must show that the defendant's proffered reason is a mere pretext for discrimination.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 2003 WL 1988534 (Oct. 6, 2003).  To survive summary judgment, the plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994))[18].

As to this  remaining timely allegation, Kasper fails to make a valid prima facie case of discrimination under Title VII.  She has offered no direct or indirect evidence that the attempted removal caused her to suffer any adverse employment action, which the Second Circuit has defined as a "materially adverse change in the terms and conditions of employment."  Sanders v.

---

[18] The McDonnell Douglas burden-shifting framework is only necessary when the plaintiff has failed to offer direct evidence of discriminatory intent.  See Swierkiewicz v. Sorema, 534 U.S. 506, 511 (2002) ("If a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case.") (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)); Johnson v. New York, 49 F.3d 75, 78 (2d Cir. 1995) ("The McDonnell Douglas framework, which guided the district court's analysis, is intended to assist the fact-finding process when the plaintiff is unable to present direct evidence of discrimination.").  Here, the plaintiffs have not offered any direct evidence of discriminatory intent; therefore, the McDonnell Douglas inquiry is appropriate.

15

N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  To qualify as "materially adverse," such an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003).  Examples of sufficiently material adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities . . . ."  Id.  Kasper has suffered none of these adverse actions, nor anything comparable to the examples offered.  Ultimately, Kasper was not even removed from the committee.  An allegation of attempted removal, without more, does not create a cause of action under Title VII.

For the above reasons, summary judgment is granted for defendant Middletown as to all plaintiffs' claims of discrete acts of sex discrimination by Middletown.

### 2.    Hostile Work Environment

While plaintiffs have charged Middletown for discriminating against them on the basis of sex in violation of Title VII, they have not stated specifically under which theory of employment discrimination they bring this action.  Title VII prohibits discrete acts of disparate treatment, as discussed supra, but also proscribes hostile work environment sexual harassment.  As certain of plaintiffs' allegations potentially support a hostile work environment claim, the Court evaluates their allegations under this latter theory in the interest of completeness.

In order to prevail on a claim of hostile work environment, a plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  Alfano v. Costello, 294 F.3d 365, 373 (2d

Cir. 2002) (quoting <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 149 (2d Cir. 1997)). Because hostile environment claims "are different in kind from discrete acts" and by "their very nature [involve] repeated conduct," a different statute of limitations applies. <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 (2002). Unlike discrete acts, for which charges of each violation must be filed with a state or federal agency within the requisite 180 or 300 days to be timely, "the entire time period of the hostile environment may be considered by a court" as long as the employee has filed a timely charge as to "<u>any</u> act that is part of the hostile work environment." <u>Id</u>. at 117-18 (emphasis added).

Kasper filed a timely charge with the CHRO as to her attempted removal from the retirement committee in June 2000. Under the rubric established by <u>Morgan</u>, Kasper's one timely charge allows the Court to consider the entire time period of any hostile work environment. Accordingly, the Court will consider all of Kasper's allegations against Middletown—that white collar employees were forced to work under a less advantageous contract; that Middletown conspired with Local 466 to prevent her from being elected to a union office; that upon being informed that Kasper had been verbally harassed by Local 466 officials, the Middletown Human Resources Department failed to respond; and that Middletown attempted to remove her from the city employees' retirement committee—in determining whether Kasper suffered from a hostile work environment.

An actionable hostile work environment is one "permeated with 'discriminatory intimidation, ridicule, and insult,' [and] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment. . . .'" <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 65, 67 (1986)). Conduct that does not

meet the "severe or pervasive" standard is redressable through Title VII.  See id.  While analysis is based on the totality of the circumstances on a case-by-case basis, a plaintiff seeking to establish a hostile work environment generally "must demonstrate that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted" to constitute pervasiveness.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).

The Court holds that Kasper has not alleged conduct that is either sufficiently severe or pervasive to establish a hostile work environment.  Kasper has not alleged a continuous, concerted course of action that pervasively worsened her work environment, nor has she alleged any single incident so intimidating or abusive that it altered the conditions of her employment.  Kasper does allege that she was subjected to repeated verbal harassment: She claims that a Local 466 official repeatedly called her "babe" and responded to her complaints about male union management by asking, "What do you want us to do, buy pantyhose?"[19]  While no doubt upsetting to Kasper, these comments do not demonstrate that her workplace "was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).

Kasper makes three remaining allegations: that Middletown conspired with Local 466 to prevent her from being elected to union office in January 1999; that when she was verbally

---

[19] Kasper alleged that she was verbally harassed by Local 466 officials "on behalf of defendant Local 466."  See Doc. #1 at ¶ 23.  To hold Middletown liable for these actions under Title VII, Kasper would further have to demonstrate "a specific basis for imputing the conduct creating the hostile work environment to the employer."  Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004).  That burden may be satisfied by a showing that "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  Id. (quoting Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir. 1994).  Kasper alleged that she reported the harassment to Middletown's Human Resources Department, which took no action.  Middletown's alleged failure to respond is moot, however, because the conduct does not rise to the level of a hostile work environment.

harassed by a union official, she complained to the Middletown Human Resources Department, which failed to respond; and that Middletown attempted to remove her from the city employees' retirement committee in June 2000.[20]  These incidents are too few in number and too distant from one another in time to be considered a sufficiently continuous and concerted series of events for hostile work environment liability.[21]  See Alfano, 294 F.3d at 379-80.  Any hostile work environment claim by Kasper fails as a matter of law.

Kerkes' allegations are identical to Kasper's, with the exception that Kerkes makes no claims that she was the subject of individual harassment or insult.  If Kasper's claim of a hostile work environment fails as a matter of law, a fortiori so must Kerkes'.  Therefore, the Court grants summary judgment for defendant Middletown on Count One, as to all claims of hostile work environment alleged by both plaintiffs.

### C. Plaintiffs' Title VII Claims Against Local 466 (Count Two)

#### 1.     Discrete Employment Actions

Kasper and Kerkes allege six instances of discrimination by Local 466: that Local 466 and Middletown entered into a more advantageous collective bargaining agreement, the terms of which applied only to designated blue-collar employees; that Local 466 conspired with

---

[20] Kasper provides no dates for when the alleged verbal harassment occurred.  From the structure of her complaint, the Court infers that it took place sometime between January 1999 and June 2000.

[21] The Court also does not find Kasper's claim that she, as a white-collar employee, was forced to work under a less advantageous contract than blue-collar employees supports hostile work environment liability.  Kasper fails to provide any evidence that the experience of working under a different contract specifically caused her work environment to be permeated with discriminatory ridicule, harassment, or insult.  While the circumstances surrounding the collective bargaining agreement may be otherwise actionable, they fail to constitute harassing behavior sufficiently severe or pervasive to cause a hostile work environment.  See Brown v. Coach Stores, 163 F.3d 706, 713 (2d Cir. 1998).

Middletown to prevent the plaintiffs from being elected as union officers; that after the discriminatory election, Local 466 appointed an all-male negotiating committee, whose members refused to address the concerns of white-collar employees; that upon Kasper complaining about the election process, a Local 466 official began to verbally harass her; that Local 466 retaliated against the plaintiffs by attempting to expel them from the union; and that Local 466 attempted to remove Kasper as a member of the committee overseeing the Middletown city employees' retirement system. Although Local 466 is neither Kasper's nor Kerkes' employer, Title VII also prohibits labor organizations from discriminating against individuals on the ground of sex. See 42 U.S.C. § 2000e-2(c).

Defendant Local 466 has moved for summary judgment on these claims on the ground that plaintiffs failed to file timely administrative charges as required by Title VII. As discussed previously, based upon the dates that Kasper and Kerkes filed charges with the CHRO, they are time-barred here from bringing claims based on events that occurred before October 28, 1999 and November 1, 1999, respectively. The parties agree that the union election at issue occurred in January 1999. Therefore, plaintiffs' second allegation that the election was conducted in a discriminatory fashion is time-barred under Title VII. Plaintiffs' third allegation, that Local 466 appointed an all-male negotiating committee immediately after the election, also is time-barred. The remaining allegations will be analyzed on their merits.

The first of Kasper's and Kerkes' allegations is that Local 466's collective bargaining process and resulting contracts were more advantageous to blue-collar employees, since that group of employees received the contract's higher benefits for a period of seven months before

the contract was extended to white-collar workers.[22]  The plaintiffs, however, neither have shown

that they suffered an adverse employment action due to the implementation of the contract, nor

have they made a prima facie case that any practice contained in the collective bargaining

agreement caused a disparate impact upon women in the union.[23]  Any claims based on this

allegation fail as a matter of law.

Kasper's fourth allegation against Local 466 is that a union official began to harass her

after she complained about favoritism shown to blue-collar employees.  Because Kasper has not

shown that she suffered any adverse employment action as a result of the claimed harassment,

she fails to make a prima facie case of discrimination as to this allegation.

Finally, Kasper and Kerkes allege that Local 466 retaliated against them by attempting to

expel them from the union, and that Local 466 attempted to remove Kasper as a member of the

committee managing the Middletown city employees' retirement system.  As discussed

previously, allegations of attempted removal, without more, do not constitute evidence of an

adverse employment action.   The plaintiffs must show they suffered a "materially adverse

---

[22] Neither group of employees, however, ultimately received better salary or benefits than the other, since upon being subject to the new collective bargaining agreement, workers received additional monies to compensate them as of the contract's retroactive date of June 30, 1999.

[23] While plaintiffs complain that they were not subject to the new collective bargaining agreement's terms as immediately as the blue-collar workers, the plaintiffs have not established an adverse employment action, as they did not suffer any diminution in their own benefits or other materially adverse change in the terms and conditions of their employment.  As for plaintiffs' putative disparate impact claim, plaintiffs did include some figures in their complaint showing that Local 466's white-collar workers were predominantly female, while the union's blue-collar workers were predominantly male.  Such figures may suggest a "bottom-line" gender imbalance in the union.  That kind of data standing alone, however, can not establish a prima facie disparate impact claim.  See, e.g., Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 160 (2d Cir. 2001).  In responding to the defendants's summary judgment motions, plaintiffs failed to provide any evidence supplementing the allegations in their complaint.

change in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin.,

361 F.3d 749, 755 (2d Cir. 2004). Because they have not done so, plaintiffs have failed to make

a prima facie case of discrimination on these claims.[24]

For the above reasons, the Court grants summary judgment for defendant Local 466 as to

all claims of discrete acts of discrimination alleged by plaintiffs.

## 2. Hostile Work Environment

While Title VII prohibits labor organizations from discriminating against their members,

it does not impose liability on a labor organization if one of its members experiences a hostile

---

[24] As to plaintiffs' claims of attempted expulsion, Local 466 alternatively argues that these claims are time-barred. In support of its argument, Local 466 offered an exhibit from an AFSCME judicial panel member's decision, expelling plaintiffs from the AFSCME International parent union on August 12, 1999. See Docs. # 52, 53. This date falls outside the 300-day limitations period for Title VII claims. Therefore, Local 466's attempt or effort to have the International expel plaintiffs could not have occurred within the appropriate limitations period under Title VII.

In response to Local 466's assertions, plaintiffs filed a motion to strike this exhibit, and a portion of Local 466's Rule 56 statement concerning the expulsion, on the grounds that they were hearsay and that findings made in a private proceeding had no collateral estoppel value in this action. See Doc. # 58. In both their complaint and their own Rule 56 statement, plaintiffs continued to allege only that Local 466 attempted to expel them. In neither filing did the plaintiffs offer any dates as to when this attempted expulsion took place. The Court therefore relies on the AFSCME record and defendants' Rule 56 statements to establish the appropriate dates, since it has no contrary evidence before it, and it is likely that the decision of the AFSCME judicial panel member would be admitted as a business record under Fed. R. Evid. 803(6), at least for the purpose of establishing that a ruling of expulsion was made and its date. The Court concludes that plaintiffs' allegations fail as a matter of law on either of two grounds: because they are time-barred under Title VII, or because plaintiffs alleged only that they were subject to attempted expulsion by Local 466, and therefore failed to show evidence of an adverse employment action.

To clarify a fine point apparently recognized by the plaintiffs in their complaint and Rule 56 statement, it was Local 466 that attempted to expel plaintiffs, but it was only the International that apparently had the authority to expel them. That is because it was not expulsion from Local 466 that was pursued, but expulsion from the International. That expulsion occurred on August 12, 1999, and Local 466's efforts at expulsion preceded it. The International is not a defendant here, so the plaintiffs only challenge the attempt or effort of Local 466 to produce the expulsion of plaintiffs from the International.

work environment.  The hostile work environment theory grows out of 42 U.S.C. § 2000e-2(a)(1)'s language that employers may not discriminate in regard to any of the "terms, conditions, or privileges" of employment.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002).  There is no such parallel language in the provisions of Title VII applicable to labor organizations.[25]  Because hostile work environment liability is limited to employers, any claims by plaintiffs against Local 466 under this theory fail as a matter of law.  For the above reasons, summary judgment is granted for defendant Local 466 as to any claims of hostile work environment alleged by plaintiffs.

**D.    Plaintiffs' Section 1983 Claims Against Defendants (Count Three)**

In the third count of their complaint, plaintiffs allege that Middletown and Local 466 conspired to deprive them of their Fourteenth Amendment right to equal protection of the laws, in violation of 42 U.S.C. § 1983.  Both Middletown and Local 466 have raised various defenses as to why they are entitled to summary judgment on these claims.  Each defendant's arguments will be examined in turn.

**1.    Middletown's Defenses to Section 1983 Claims**

Middletown argues that it is entitled to summary judgment on this claim because it has municipal immunity under the guidelines established by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1976).  Section 1983 provides a remedy when any person

> under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution

---

[25] Of course, if the labor organization is sued in its capacity as an employer, it may be subject to hostile work environment liability.  See generally Yerdon v. Henry, 91 F.3d 370 (2d Cir. 1996).  Neither of the plaintiffs in this case has suggested that Local 466 is her employer.

and laws. . . .

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights," and may not be

used to assert Title VII claims.  Baker v. McCollan, 433 U.S. 137, 144 n. 3 (1979).  A Title VII

plaintiff, however, may bring a concurrent § 1983 claim, as long as "some law other than Title

VII is the source of the right alleged to have been denied."  Saulpaugh v. Monroe Cmty. Hosp., 4

F.3d 134, 143 (2d Cir. 1993).  Here, the plaintiffs claim that Middletown's alleged discriminatory

acts independently violated their constitutional rights to equal protection.

        In Monell, the Supreme Court examined the question of whether a municipality ever

could be considered a "person" for the purposes of a section 1983 action.  The Court determined

that local governments were not wholly immune from suit under the statute, but also held that

municipalities could not be held liable solely on a theory of respondeat superior.  See Monell,

436 U.S. at 663.  Therefore, in a section 1983 action, municipalities are not liable for the

constitutional torts of their employees.  Local governments only may be sued for actions that

implement or execute a discriminatory "policy statement, ordinance, regulation, or decision

officially adopted and promulgated by" municipal officers, or for "deprivations visited pursuant

to governmental 'custom' even though such a custom has not received formal approval through

the body's official decisionmaking channels."  Id. at 690-91.  Finally, "although in certain

circumstances a Title VII claim may be established through proof of a defendant's mere

negligence . . . a plaintiff pursuing a claimed violation of . . . denial of equal protection under §

1983 must show that the discrimination was intentional" on the part of the defendant.  Patterson

v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004).

        To survive a motion for summary judgment on their section 1983 claims, the plaintiffs

not only must show that they suffered a deprivation of rights based upon municipal policy or custom, but that their claims are not time-barred. Discrimination claims pursued through § 1983 are not subject to the timely-filing provisions of Title VII. Instead, the federal court looks to state law for the analogous personal injury statute of limitations. "In Connecticut, actions based on 42 U.S.C. § 1983 are governed by a three-year statute of limitations, as provided by Conn. Gen. Stat. § 52-577." Manatuck Assocs. v. Wendt, 1997 U.S. Dist. LEXIS 19726, * 43 (D. Conn. Nov. 21, 1997). Because this action was filed on May 15, 2002, the plaintiffs may not bring claims based on conduct that occurred before May 15, 1999. Plaintiffs' timely allegations against Middletown that may be considered under § 1983 therefore include the contract negotiations with Local 466 beginning in August 1999, as well as Middletown's attempted removal of Kasper from the city employees' retirement committee in June 2000.

The collective bargaining agreement between Middletown and Local 466 may qualify as a municipal "policy" under Monell, since Middletown signed and adopted the provisions of the agreement. The plaintiffs, though, have not made any showing that the policy itself was discriminatory, other than to claim that the agreement's terms applied first only to blue-collar employees. Their real claim is that the underlying negotiation process was discriminatory, causing the white-collar workers not to be extended the contract's benefits for an additional seven months. A municipality may only be held liable when the policy itself, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Back v. Hastings-on-Hudson Union Free Sch. Dist., 365 F.3d 107, 128 (2d Cir. 2004) (quoting Monell, 436 U.S. at 694).

Further, the plaintiffs have not identified any specific actions taken by Middletown in

25

implementing that collective bargaining agreement which worked a discriminatory deprivation upon them on the basis of sex. To make out a claim of gender discrimination in violation of the Equal Protection Clause, a plaintiff "must prove that she suffered purposeful or intentional discrimination on the basis of gender." Id. at 118. The plaintiffs have offered no evidence that the collective bargaining process was motivated by discriminatory intent on the part of Middletown, as Patterson and Back require. Nor have they offered any evidence to discount Middletown's proffered nondiscriminatory reason for separating the two bargaining processes (i.e., because the white-collar employees had a pending petition for independent representation) as pretextual. Nor have they alleged that they were treated differently from similarly situated employees (e.g., male white-collar workers). Finally, any claim of deprivation is undercut by the fact that in October 2000, white-collar workers received additional compensation to make them whole as of the contract's retroactive effective date of June 30, 1999, leaving them in the same position as blue-collar workers.

Generally, summary judgment is to be used sparingly when the threshold question is one of the defendant employer's intent. See Dister v. Continental Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988). Nonetheless, to survive summary judgment, the plaintiff must "offer 'concrete evidence from which a reasonable juror could return a verdict in his favor,' and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Because plaintiffs have failed to offer any such concrete evidence, they have failed to make a prima facie case of denial of equal protection. See also Patterson, 375 F.3d at 228-29 (holding that conclusory and unsupported assertions by plaintiff are insufficient to withstand a motion for summary judgment

on a section 1983 claim).

Kasper also alleges that Middletown attempted to remove her as a member of the city employees' retirement system. She has provided no evidence that this attempted removal was pursuant to any municipal policy or custom. Nor has she provided any evidence that she suffered a constitutional deprivation, since her ouster from the committee was attempted but not completed. Kasper fails to make a prima facie case of denial of equal protection on this claim.

Accordingly, the Court grants summary judgment for defendant Middletown as to plaintiffs' claims under 42 U.S.C. § 1983.

### 2.    Local 466's Defenses to Section 1983 Claims

Local 466 argues that it also is entitled to summary judgment on the plaintiffs' § 1983 claims, on the grounds that a union is not properly a state actor under § 1983, and thus its actions cannot be reached through the provisions of that statute. Generally, labor unions are not considered state actors. See Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002). Plaintiffs concede that Local 466 is not a governmental entity; instead, they allege that because Local 466 engaged in concerted activity with the city of Middletown to deprive plaintiffs of their constitutional rights, the labor union's actions were carried out under color of state law.

A private entity may be found liable under § 1983 if it "is a willful participant in joint activity with the State or its agents." Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970) (quoting United States v. Price, 383 U.S. 787, 794 (1966)). A "merely conclusory allegation" of such concerted activity, however, "does not suffice to state a § 1983 claim against the private entity." Ciambriello, 292 F.3d at 324. In order to defeat a motion for summary judgment on such a claim, "plaintiffs must present sufficient evidence to support an inference that an improper

conspiracy took place." McGovern v. Local 456, Internat'l Brotherhood of Teamsters, 107 F.

Supp. 2d 311, 316-17 (S.D.N.Y. 2000).

Plaintiffs have provided no specific evidence of concerted conduct by Middletown and

Local 466, other than their claim that the defendants jointly arranged to transport blue-collar

workers in city vehicles to a union election, a privilege denied to white-collar workers.  That

election, however, took place in January 1999 and therefore is barred by the three-year statute of

limitations applicable to § 1983 actions.

Plaintiffs also allege that Local 466 and Middletown acted in concert to negotiate a more

advantageous contract for blue-collar employees.  When a union represents city employees in

contract negotiations, however, it is considered to be acting adversely to the city government and

not acting under color of state law.  See id. at 317; see also Philadelphia Fraternal Order of

Correctional Officers v. Rendell, 1996 U.S. Dist. LEXIS 7621, *26 (E.D. Pa.  June 4, 1996)

(holding same).  While theoretically it is possible that a union could collude with a municipality

to disadvantage a selected group of workers, plaintiffs have failed to offer even a scintilla of

evidence that Local 466 and Middletown were so colluding or otherwise operating under

improper motives.  Although white-collar employees worked under the old contract for seven

months longer than blue-collar employees, that fact alone is insufficient for the Court to infer that

the defendants engaged in concerted discriminatory conduct in an attempt to produce such a

result.

Finally, plaintiffs allege that Local 466 acted in concert with Middletown in its attempted

removal of plaintiff Kasper from the city employees' retirement committee in June 2000.

Plaintiffs, however, have provided no evidence of such concerted activity, other than to allege

that it took place.  As Ciambriello states, such conclusory allegations are insufficient to withstand

a summary judgment motion.  Ciambriello, 292 F.3d at 324.  Therefore, the Court grants

summary judgment for defendant Local 466 as to all plaintiffs' claims under 42 U.S.C. § 1983.[26]

### 4.    Plaintiffs' Claims of Intentional Infliction of Emotional Distress (Count Four)

In Count Four of their complaint, plaintiffs allege that the defendants' discriminatory

conduct constituted the common law tort of intentional or reckless infliction of emotional

distress.  Because it has disposed of all the federal claims before it, the Court declines to exercise

supplemental jurisdiction over the plaintiffs' remaining state law claim.    See 28 U.S.C. §

1367(c)(3).  Both the Second Circuit and the Supreme Court agree that when all federal claims

are dismissed, the "state claims should be dismissed as well."  Lanza v. Merrill Lynch & Co., 154

F.3d 56, 61 (2d Cir. 1998) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).

### III.    Conclusion

For the reasons stated above, defendants Middletown and Moore's Motion to Dismiss or

in the Alternative for Summary Judgment [Doc. # 47] and defendant Local 466's Motion to

Dismiss or for Summary Judgment [Doc. # 50] are GRANTED in their entirety.  The clerk is

---

[26] Additionally, if plaintiffs are claiming that their attempted expulsion from AFSCME International by Local 466 is actionable under 42 U.S.C. § 1983, that claim is also barred. Although the three-year statute of limitations for § 1983 actions (here, encompassing events occurring after May 15, 1999) may include some conduct beyond the 300-day period that applies to Title VII claims, any § 1983 claim can not succeed because it is based only on attempted expulsion.  See n. 24, supra.

directed to order judgment in favor of the defendants and close this case.

SO ORDERED this ____13th____ day of January 2005 at Hartford, Connecticut.


_____    _____/s/ CFD_____
                                          **CHRISTOPHER F. DRONEY**
                                          **UNITED STATES DISTRICT JUDGE**